**STARK & STARK**
A Professional Corporation
By:    Stefanie Colella-Walsh, Esq.
       Gene Markin, Esq.
993 Lenox Drive
Lawrenceville, NJ 08648-2389
Ph:  (609) 896-9060
Fax: (609) 895-7395
*Attorneys for Plaintiff, SMA Medical Laboratories, Inc.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| SMA MEDICAL LABORATORIES, INC.<br><br>           Plaintiff,<br><br>vs.<br><br>ADVANCED CLINICAL LABORATORY SOLUTIONS, INC.; and LEONID REYFMAN, M.D.,<br><br>           Defendants. | CIVIL ACTION NO.: _____<br><br><br>**COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff, SMA Medical Laboratories, Inc. ("Plaintiff" or "SMA"), by and through its attorneys, Stark & Stark, A Professional Corporation, hereby files this Complaint for damages against Advanced Clinical Laboratory Solutions, Inc. ("ACLS") and Leonid Reyfman, M.D. ("Reyfman"), and in support thereof avers as follows:

### NATURE OF ACTION

1.    This matter arises out of SMA's contract with ACLS for reference laboratory services, which included providing toxicology testing services for SMA's customers consisting of physicians, medical practice groups, hospitals, outpatient facilities, clinics, and other medical providers. *See* Reference Laboratory Services Agreement between ACLS and SMA dated April 14, 2014 (without exhibits) (the "Contract"), attached hereto as **Exhibit A**. ACLS contracted to

provide the reference laboratory services for SMA and agreed not to use or to disclose any confidential information, trade secrets, or customer lists of SMA during the term of the Contract. ACLS further agreed not to contact, solicit, or collect fees from any of SMA's customers for purposes of providing or selling services offered by SMA for the duration of the Contract and for twenty-four months following termination of the Contract. Unbeknownst to SMA, and without permission or authorization from SMA, ACLS, under the direction and control of Reyfman, used SMA's confidential information and customer lists to directly and indirectly solicit SMA customers in order to divert business away from SMA. As a result of SMA's intentional, tortious, and malicious conduct, SMA has been damaged through the loss of business in an amount estimated to be in the multi-millions of dollars.

## THE PARTIES

2.      SMA Medical Laboratories, Inc. ("SMA") is a Pennsylvania corporation with its principal place of business at 940 Pennsylvania Blvd, Suite E, Feasterville, PA 19053. SMA is an accredited reference laboratory performing routine and esoteric diagnostic testing. SMA provides a wide range of testing services from routine blood tests such as total cholesterol and white blood cell count to complex panels, such as heavy metals, allergy, cardiac risk & weight loss profiles, which aid in the diagnosis or detection of diseases, and measure the progress or recovery from a disease.

3.      Advanced Clinical Laboratory Solutions, Inc. ("ACLS") is a New York corporation with its principal place of business at 2277-83 Coney Island Ave #3B, Brooklyn, NY 11223. ACLS is a competitor of SMA and is also engaged in the business of providing diagnostic laboratory testing services to patients, physicians and medical centers across the country.

4847-1593-7869, v. 1

4.      Leonid Reyfman, M.D. ("Reyfman") is an individual residing in the State of New York.  At all times relevant to this Complaint, Reyfman was the owner and COO of ACLS and had the power and ability to control ACLS's business operations and to make decisions on behalf of ACLS.

5.      Needing the specific testing services performed by ACLS to fully service its customers, SMA entered into a contract with ACLS to provide toxicology laboratory services for SMA and SMA's customers.  *See* Exhibit A.  Given the proprietary nature of the confidential information ACLS would have access to in the performance of its testing services, the Contract between SMA and ACLS specifically provided protections against the misappropriation of SMA's confidential business information, including customer identifications, by prohibiting, *inter alia*, ACLS from using SMA's confidential business information to solicit or contact SMA's customers, unless ACLS received written approval from SMA.  *Id.* at pp. 2-4, §§ 8-12.

6.      SMA has recently learned that ACLS, in contravention of its contractual and common law obligations and duties, and at the direction and behest of Reyfman, has knowingly and intentionally used SMA's confidential information to solicit SMA's customers and to divert business away from SMA.

### JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 based upon a federal question (Defend Trade Secrets Act).

8.      This Court also has subject matter jurisdiction over this civil action pursuant to 28 U.S.C. § 1332(a) because it involves a dispute between citizens of different States and the matter in controversy exceeds the sum or value of $150,000, exclusive of interest and costs.

4847-1593-7869, v. 1

9.      Plaintiff SMA is a citizen of the Commonwealth of Pennsylvania, Defendant ACLS is a citizen of the State of New York, and Defendant Reyfman is a citizen of the State of New York.

10.     ACLS conducts business in Pennsylvania by providing testing lab services for Pennsylvania patients, companies, and medical providers.

11.     Additionally, during the pendency of the Contract, ACLS and Reyfman had regular and systematic contacts with the State of Pennsylvania, including by and through its dealings with SMA and its solicitation of SMA's customers located or doing business in Pennsylvania.

12.     Venue in this Court is proper pursuant to 28 U.S.C. § 1391(b)(2).

13.     Venue and jurisdiction are, therefore, appropriate in this judicial district.

## BACKGROUND FACTS

A.    **The Contract**

14.     SMA is a full service diagnostic testing service provider offering basic and complex laboratory testing services.

15.     In 2014, SMA was not approved to process toxicology specimens for its provider customers and was therefore in need of a laboratory that provided those services, such as ACLS.

16.     On or about April 14, 2014, SMA entered into a contract with ACLS for the performance of reference laboratory services on an as-needed basis for SMA customers.  *See* Exhibit A.

17.     On or about April 18, 2014, Mark Shvartsburd signed the Contract on behalf of SMA and Anatoly Mecrovich, M.D. signed the Contract on behalf of ACLS as well as initialed every page of the Contract to evidence his understanding and agreement to the terms contained therein.  *Id.* at p. 9.

18.      The Contract requires ACLS to test specimens received by ACLS from SMA or SMA customers and then to provide SMA with a testing report with the results of the testing. *Id.* at pp. 1-2, §§ 1-5.

19.      ACLS's performance of its testing services under the Contract necessarily required SMA to provide ACLS with confidential business information, including but not limited to, SMA customer identification and contact information, non-public competitive business information, and SMA's trade secrets.

20.      As such, SMA required that ACLS agree to use such confidential business information "solely for SMA's benefit." *Id.* at p. 2, § 8.

21.      The Contract defines "Confidential Information" as "any data or information, other than Trade Secrets, that is valuable to SMA and not generally known to the public or to competitors of SMA." *Id.* at p. 3, § 10.1.

22.      The Contract defines "Trade Secret" as follows:

> "Trade Secret" means information including, but not limited to, business plans and methods, trade secrets, products, services, financial affairs, formulae, technology, know-how, *contracts, contact lists,* costs, policies, sales methods, financial information, profits, expenses, operations, operating methods and procedures, processes, statistics, suppliers, marketing data, strategic information, sales and plans for future developments, methods, reports, plans, strategies and efforts, *medical providers, customers, customer lists, customer requirements and information,* prospective customers, customer files, proposals and *communications with customers and prospective customers,* fees, information regarding meeting attendees, employee lists and information, financial and other record systems, records, applications, computers, computer programs, system documentation, hardware, software and information contained therein, marketing and expansion plans, technologies, development, projects, forms and other trade secrets, inventions, designs, know-how, any facts concerning the systems, methods, procedures or plans developed or used by SMA or Company Business Relationships or other private, confidential or proprietary

information of or about SMA, or Company Business Relationships
which is not already available to the public.

[*Id.* at pp. 3-4, § 10.1 (emphasis added)]

23.     The Contract defines SMA's "Customers" as "medical providers including but [not]
limited to physicians, group practices, hospitals, outpatient facilities, ASCs and clinics". *Id.* at p.
1, ¶ B.

24.     By entering into the Contract with SMA, ACLS agreed to "not use or disclose,
directly or indirectly, for any reason whatsoever or in any way, other than at the direction of SMA
during the course of this Agreement or after receipt of the prior written consent of SMA, any
Confidential Information of SMA, that comes into [ACLS's] knowledge during the term of this
Agreement". *Id.* at pp. 2-3, at § 9.

25.     Furthermore, ACLS agreed not to contact or solicit any of SMA's customers or to
collect any fees from SMA's customers without the prior consent and approval of SMA:

> **Further contacts with the Customers (Non-Circumvention).**
> *[ACLS] agrees not to contact or initiate contact at any time for any*
> *purpose, either directly or indirectly, any Customer of SMA or any*
> of such Customer's officers, directors, shareholders, consultants,
> attorneys, employees, agents or other affiliates of the Customer, or
> any other property or properties whose identity was revealed through
> the efforts of SMA, unless such approval is specifically granted in
> written form by SMA on a case-by-case basis. *[ACLS] further*
> *agrees not to undertake any transaction or a series of transactions of*
> *any kind with the Customer or to collect any fees in connection with*
> *the Customer without the express prior written agreement of SMA,*
> *which agreement may be withheld in SMA's sole discretion.*

[*Id.* at p. 4, § 11 (bolding in original, italics added).]

26.     The Contract also contains a non-solicitation clause prohibiting ACLS from
soliciting any of SMA's customers for the purposes of providing them with any services offered by

SMA for a period of two (2) years following the termination or expiration of the Contract. *Id.* at p. 4, § 12.

27.     With respect to damages and enforcement, the Contract provides that SMA is "entitled to recover any damages proved to have been caused by any breach of [ACLS's] covenants and agreements hereunder," and specifically allows for the recovery of attorney's fees:

> In the event SMA is required to enforce the terms of this Agreement through court proceedings, *the prevailing party will be entitled to reimbursement for all reasonable legal fees, costs and expenses incident to such enforcement proceedings*, including at the pre-trial level, trial level, and appellate level.
>
> [*Id*. at p. 5, § 16 (emphasis added).]

28.     The Contract expired on March 31, 2016, but was automatically renewed until September 9, 2016 when the New York Department of Health shut ACLS down for failing to perform calibration and quality control procedures properly and ACLS could no longer perform toxicology testing services under the Contract.

**B.     SMA's Business, Customers, and Marketing Consultants**

29.     Over the years, SMA has established itself as a leading provider of laboratory testing services in the Tri-State area.

30.     In early 2015, SMA was approved to perform toxicology testing, but continued to send samples to ACLS pursuant to the Contract for a variety of business and economic reasons.

31.     SMA has invested significant time and money into cultivating and maintaining relationships with its customers, which include physicians, medical offices, hospitals, clinics, and other medical service providers.

32.     The medical laboratory testing market is ultra-competitive with many competitors offering the same array of diagnostic and clinical testing services; therefore, SMA takes great

4847-1593-7869, v. 1

measures to protect certain confidential information and trade secrets that give SMA a competitive advantage in the industry, including but not limited to, customer lists, customer contacts, and testing result information.

33.     Part of SMA's business development strategy is to hire independent marketing representatives to solicit new and existing customers for SMA.

34.     SMA pays a commission to its marketing representatives who serve as SMA's marketing and sales force in attracting new clients and customers.

35.     SMA relies on its marketing representatives to develop business for SMA and to seek out new clients who are in need of SMA's services.

C.     ACLS's Access to SMA's Confidential Information

36.     SMA entered into the Contract with ACLS because at the time it did not have the ability to provide certain toxicology testing, which some of its customers required.

37.     ACLS agreed to provide the needed testing services for SMA subject to the terms, conditions, and restrictions in the Contract.

38.     By providing the testing services for SMA, ACLS received certain proprietary information, such as the name and identification of the physicians and medical providers who ordered the samples as well as information regarding the patients whose samples were being tested.

39.     By performing work under the Contract, ACLS learned the identity of SMA's customers and the type of tests ordered by those customers.

40.     ACLS also learned of SMA's marketing representatives, SMA's arrangement with those marketing representatives, and the manner in which those marketing representatives solicited clients for SMA.

4847-1593-7869, v. 1

41.     By virtue of its performance of services for SMA pursuant to the Contract, ACLS became intimately familiar with all aspects of the SMA customers it serviced and had access to many of SMA's trade secrets, modes of operation, business development and marketing strategies, and pricing/cost details.

**D.     ACLS's Breach & Intentional Interference with SMA's Business**

42.     After ACLS was shut down by the New York State Department of Health, SMA learned that ACLS had misappropriated SMA's confidential business information for ACLS's benefit without the knowledge or consent of SMA.

43.     Specifically, SMA learned that ACLS used and was using SMA's customer lists and contact information to contact and solicit business from SMA's customers and to divert customers away from SMA.

44.     To that end, ACLS contacted, engaged, and paid SMA's marketing representatives to solicit SMA's customers on behalf of ACLS.

45.     In contravention of the confidentiality, non-circumvention, and non-solicitation provisions in the Contract, ACLS intentionally utilized SMA's customer lists, contact lists, and other proprietary information to solicit SMA's customers, to provide services directly to SMA's customers, and to steal business away from SMA.

46.     Additionally, ACLS intentionally and tortiously interfered with SMA's business relationships by soliciting and hiring SMA's marketing representatives to contact SMA's current and prospective customers on behalf of ACLS.

47.     ACLS performed the foregoing acts at the direction and behest of Reyfman, who knowingly and intentionally sought to use ACLS's contractual relationship with SMA, specifically ACLS's access to SMA's economically valuable confidential and proprietary business information

4847-1593-7869, v. 1

and trade secrets, in order to divert customers away from SMA and to profit at the expense of SMA and SMA's business.

48.     All the foregoing acts were done intentionally, willfully, and with knowledge of the pecuniary harm they would cause SMA.

49.     ACLS's billing records and statement of accounts will show the names of the doctors, offices, and clinics ACLS performed work for during the relevant time period.

50.     ACLS's accounting and payment records will show the amount of commissions paid to SMA's marketing representatives, which will in turn indicate how much revenue ACLS earned from soliciting SMA's clients; in fact, Reyfman provided Mr. Shvartsburd with a commission printout summary for one marketing representative showing commissions paid to that representative in the amount of $1.2 million.

51.     Upon information and belief, ACLS hired more than a dozen marketing representatives to solicit SMA's clients and earned more than $15 million in revenues from the misappropriation of SMA's confidential business information, trade secrets, and other proprietary information.

<u>COUNT I</u>

**BREACH OF CONTRACT**

*(Plaintiff SMA v. Defendant ACLS)*

52.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

53.     The Contract entered is valid, enforceable, and supported by adequate consideration.

54.     SMA has performed its obligations under the Contract and all conditions precedent to enforcement of the Contract have been satisfied.

55.     ACLS breached and violated the Contract, including Sections 8, 9, 11, and 12, by the foregoing conduct, including soliciting SMA's customers by misappropriating SMA's confidential information to the benefit of ACLS and to the detriment of SMA.

56.     Upon information and belief, ACLS is continuing to violate its contractual obligations.

57.     As a consequence of the foregoing, SMA has suffered and will continue to suffer economic losses, including but not limited to, lost customers, business, revenues, and profits, as well as irreparable harm and loss of goodwill, and is entitled to compensatory damages as well as attorney's fees and costs pursuant to § 16 of the Contract, and such other legal or equitable relief that this Court deems just and proper.

## COUNT II

### MISAPPROPRIATION OF TRADE SECRETS,
### PENNSYLVANIA UNIFORM TRADE SECRETS ACT,
### 12 Pa.C.S. §§ 5301 to 5308

#### *(Plaintiff SMA v. Defendants ACLS and Reyfman)*

58.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

59.     SMA customer information, identification and contact information maintained by SMA are trade secrets subject to protection under the Pennsylvania Uniform Trade Secrets Act, 12 Pa. C.S. §§ 5301-05.

60.     The aforementioned information is a compilation of information that derives independent economic value by not being generally known to or accessible, through proper means,

11

to competitors, such as ACLS, who can profit from its explicit and/or implicit and/or intentional and/or inevitable use or disclosure.

61.     SMA has taken reasonable measures under the circumstances to maintain the secrecy of this information.

62.     ACLS was privy to this information solely as a result of its promise and agreement, contained in the Contract, to maintain its secrecy, to keep the information confidential, and to only use it for the benefit of SMA.

63.     Pursuant to the Contract, ACLS knew the aforementioned trade secrets and/or confidential information were acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

64.     The foregoing conduct of ACLS and Reyfman constitutes a misappropriation and misuse of SMA's confidential, trade secret information, without the express or implied consent of SMA.

65.     ACLS and Reyfman acted willfully and maliciously in misappropriating SMA's confidential, trade secret information for their own benefit and to the intended detriment of SMA.

66.     As a consequence of the foregoing, SMA has suffered and will continue to suffer economic losses, including but not limited to, lost customers, business, revenues, and profits, as well as irreparable harm and loss of goodwill, and SMA is entitled to compensatory damages in an amount yet to be determined pursuant to 12 Pa. C.S. § 5304(a), exemplary damages pursuant to 12 Pa. C.S. § 5304(b), attorney's fees, expenses, and costs pursuant to 12 Pa. C.S. § 5304, and such other legal or equitable relief that this Court deems just and proper.

4847-1593-7869, v. 1

## COUNT III

### MISAPPROPRIATION OF TRADE SECRETS,
### DEFEND TRADE SECRETS ACT
### 18 U.S.C. §§ 1831-1839

#### *(Plaintiff SMA v. Defendants ACLS and Reyfman)*

67.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

68.     SMA customer information, identification and contact information maintained by SMA are trade secrets subject to protection under the Defend Trade Secrets Act, 18 U.S.C. §§ 1832, 1836.

69.     The aforementioned information is a compilation of information that derives independent economic value by not being generally known to or accessible, through proper means, to competitors, such as ACLS, who can profit from its explicit and/or implicit and/or intentional and/or inevitable use or disclosure.

70.     This information is related to a product or service used in or intended for use in interstate commerce.

71.     SMA has taken reasonable measures under the circumstances to maintain the secrecy of this information.

72.     ACLS was privy to this information solely as a result of their promise and agreement, contained in the Contract, to maintain its secrecy, to keep the information confidential, and to only use it for the benefit of SMA.

73.     Pursuant to the Contract, ACLS knew the aforementioned trade secrets and/or confidential information were acquired under circumstances giving rise to a duty to maintain their secrecy and limit their use.

13

74.     ACLS and Reyfman knowingly stole, or without authorization appropriated, took, and carried away such information.

75.     ACLS and Reyfman engaged in this conduct intending or knowing that it would injure SMA, the owner of the trade secrets at issue.

76.     The foregoing conduct of ACLS and Reyfman constitutes a misappropriation and misuse of SMA's confidential, trade secret information.

77.     The Defend Trade Secrets Act provides that any organization that commits an offense under the Act "shall be fined not more than the greater of $5,000,000 or 3 times the value of the stolen trade secret to the organization." 18 U.S.C. § 1832(b).

78.     ACLS and Reyfman acted willfully and maliciously in misappropriating SMA's confidential, trade secret information for their own benefit and to the intended detriment of SMA.

79.     As a consequence of the foregoing, SMA has suffered and will continue to suffer economic losses, including but not limited to, lost customers, business, revenues, and profits, as well as irreparable harm and loss of goodwill, and SMA is entitled to compensatory damages in an amount yet to be determined pursuant to 18 U.S.C. § 1836(b)(3)(B), exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C), attorney's fees, expenses, and costs pursuant to 18 U.S.C. § 1836(b)(3)(D), and such other legal or equitable relief that this Court deems just and proper.

## COUNT IV

### MISAPPROPRIATION OF TRADE SECRETS AND CONFIDENTIAL INFORMATION UNDER NEW YORK COMMON LAW

*(Plaintiff SMA v. Defendants ACLS and Reyfman)*

80.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

4847-1593-7869, v. 1

81.     Plaintiff has a protectable trade secret in the confidential customer information it keeps, including its client names, contact information, and customer data.

82.     Plaintiff derives economic value and a competitive advantage from this trade secret due to it not being generally known to other persons who could obtain economic value form its disclosure or use.

83.     Plaintiff has made efforts that are reasonable under the circumstances to maintain the secrecy of such information.

84.     In breach of the Contract and their agreement with SMA, Defendants have used SMA's trade secret to compete with SMA and to injure SMA's relationship with its clients.

85.     Defendants have used SMA's trade secret information in bad faith for their own benefit and to the detriment of SMA.

86.     Defendants' use and misappropriation of SMA's trade secret information constitutes a misappropriation of trade secrets in violation of New York common law.

87.     As a consequence of the foregoing, SMA has suffered and will continue to suffer economic losses, including but not limited to, lost customers, business, revenues, and profits, as well as irreparable harm and loss of goodwill, and is entitled to compensatory damages as well as punitive damages, and such other legal or equitable relief that this Court deems just and proper.

## COUNT V

**CONVERSION OF TRADE SECRETS, CONFIDENTIAL INFORMATION, AND BUSINESS OPPORTUNITIES**

*(Plaintiff SMA v. Defendants ACLS and Reyfman)*

88.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

4847-1593-7869, v. 1

89.     The trade secrets, confidential information, and business opportunities referred to in this Complaint are the property of SMA and are owned by SMA.

90.     ACLS agreed to SMA's terms and conditions with respect to the protection of SMA's trade secrets, confidential business information, and business opportunities by acknowledging and signing the Contract.

91.     When ACLS executed the Contract, it acknowledged his understanding and agreement to comply with the confidentiality, non-circumvention, and non-solicitation provisions in the Contract.

92.     ACLS and Reyfman violated the terms and conditions of the Contract by, *inter alia*, using SMA's customer lists, trade secrets, and other proprietary information for its own benefit rather than for the sole benefit of SMA.

93.     ACLS and Reyfman converted SMA's proprietary confidential business information and trade secrets for their own use.

94.     ACLS and Reyfman have without authority assumed and exercised the right of ownership over SMA's confidential business information, trade secrets, and business opportunities.

95.     The conversion by ACLS and Reyfman of SMA's confidential business information, trade secrets, and business opportunities was willful and malicious.

96.     SMA has been injured as a proximate result of the conversion by ACLS and Reyfman of SMA's confidential business information, trade secrets, and business opportunities.

97.     As a consequence of the foregoing, SMA has suffered and will continue to suffer economic losses, including but not limited to, lost customers, business, revenues, and profits, as well as irreparable harm and loss of goodwill, and SMA is entitled to compensatory damages in an

16

amount to be proven at trial and punitive damages as a result of Defendants' conversion of SMA's confidential business information, trade secrets, and business opportunities, and such other legal or equitable relief that this Court deems just and proper.

## COUNT VI

## UNJUST ENRICHMENT

### *(Plaintiff SMA v. Defendants ACLS and Reyfman)*

98.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

99.     In the alternative to the breach of contract claim above, in the event the Contract is deemed unenforceable, SMA is entitled to compensation in an amount to be proven at trial and punitive damages as a result of Defendants' unauthorized use and conversion of SMA's confidential business information, trade secrets, and business opportunities.

100.     Upon information and belief, Defendants have been enriched as a result of the Defendants' misappropriation, conversion, and unauthorized use of SMA's confidential business information, trade secrets, and business opportunities to benefit Defendants and harm SMA.

101.     Upon information and belief, Defendants have been enriched as a result of SMA's breach of the contractual and common law obligations it owed to SMA.

102.     The retention of the amount by which Defendants have been enriched as a result of ACLS's and Reyfman's unlawful conduct as alleged herein, is contrary to the principles of fairness, justice, and equity.

103.     SMA is entitled to recover from Defendants the amount by which Defendants have been enriched as a result of ACLS's and Reyfman's unlawful conduct as alleged in the Complaint.

4847-1593-7869, v. 1

## COUNT VII

## TORTIOUS INTERFERENCE WITH CONTRACT

### *(Plaintiff SMA v. Defendants ACLS and Reyfman)*

104.    Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

105.    SMA entered into consulting contracts with various companies to serve as SMA's marketing representatives, to solicit prospective customers, and to promote and sell SMA's services ("Marketing Contracts").

106.    The Marketing Contracts are valid contracts that confer certain rights and obligations as between SMA and its marketing representatives.

107.    At all times relevant to the allegations of this Complaint, ACLS and Reyfman were aware that the Marketing Contracts existed between SMA and its marketing representatives.

108.    Upon information and belief, ACLS and Reyfman intentionally induced SMA's marketing representatives to breach their agreements with SMA and otherwise to fail to perform their obligations under the Marketing Contracts, including, *inter alia*, by engaging them to perform marketing and sales services for ACLS for the benefit of ACLS and to the detriment of SMA.

109.    ACLS's and Reyfman's intentional inducement of SMA's marketing representatives to breach the Marketing Contracts and otherwise to fail to perform their obligations under the Marketing Contracts was wrongful and without justification.

110.    ACLS's and Reyfman's intentional inducement of SMA's marketing representatives to breach the Marketing Contracts and otherwise to fail to perform their obligations under the Marketing Contracts has resulted in actual damage to SMA.

111.     SMA is entitled to recover compensatory damages, in an amount to be proven at trial, as well as punitive damages, for SMA's and Reyfman's unjustified and intentional inducement of SMA's marketing representatives to breach or otherwise fail to perform their obligations under the Marketing Contracts.

### COUNT VIII

### TORTIOUS INTERFERENCE WITH EXISTING AND PROSPECTIVE CONTRACTUAL AND BUSINESS RELATIONSHIPS

#### *(Plaintiff SMA v. Defendants ACLS and Reyfman)*

112.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

113.     Economic relationships have existed between SMA and its customers and other entities, which have been advantageous to SMA.

114.     Being in the business of, among other things, diagnostic laboratory testing, SMA has developed valid and existing business relationships with hundreds of customers with the probability of future economic benefit for SMA.

115.     ACLS and Reyfman knew that SMA sought to protect its relationship with its customers and only divulged certain confidential business information and trade secrets in exchange for ACLS's contractual agreement not to use that information and trade secrets to solicit SMA's customers or otherwise divert business away from SMA.

116.     In spite of this knowledge, Defendants wrongfully interfered with SMA's prospective economic advantage and existing business relationships by wrongfully using SMA's trade secrets and proprietary business information for the purpose of benefitting ACLS, a competitor of SMA.

19

117.     In spite of this knowledge, Defendants wrongfully interfered with SMA's prospective economic advantage and existing business relationships by soliciting SMA's customers and business contacts.

118.     Defendants engaged in these acts with full knowledge and intention to interfere with or disrupt the economic relationships that SMA enjoyed with its customers, and the wrongful acts described herein demonstrate Defendants' intentional conduct.

119.     Defendants' conduct was intentional and willful in that Defendants intended to harm SMA's economic and financial interests.

120.     Defendants' conduct was wrongful and not justified, privileged, or excusable.

121.     As a direct and proximate result of Defendants' wrongful conduct, SMA has suffered economic losses, including but not limited to, lost customers, business, revenues, and profits, as well as irreparable harm and loss of goodwill, and SMA is entitled to compensatory damages in an amount to be proven at trial and punitive damages as a result of Defendants' intentional, willful, and malicious conduct, and such other legal or equitable relief that this Court deems just and proper.

## COUNT IX

### UNFAIR COMPETITION

#### *(Plaintiff SMA v. Defendant ACLS)*

122.     Plaintiff repeats and realleges each and every allegation contained in the preceding paragraphs by reference as though fully set forth herein.

123.     Defendant ACLS has used, and upon information and belief is continuing to use, SMA's confidential and proprietary information, and trade secrets, in order to compete with SMA.

124.    ACLS's conduct described herein constitutes unfair competition under applicable common law.

125.    As a direct and proximate result of ACLS's wrongful conduct, SMA has suffered economic losses, including but not limited to, lost customers, business, revenues, and profits, as well as irreparable harm and loss of goodwill, and SMA is entitled to compensatory damages in an amount to be proven at trial and punitive damages as a result of Defendants' intentional, willful, and malicious conduct, and such other legal or equitable relief that this Court deems just and proper.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff SMA respectfully requests that this Court enter judgment in its favor, and against Defendants ACLS and Reyfman on all counts, and award Plaintiff the following relief:

A.    Monetary damages against Defendants jointly and severally, including compensatory damages, actual losses, and disgorgement of Defendants' ill-gotten profits;

B.    Exemplary and punitive damages as a result of Defendants' willful, intentional, and malicious conduct;

C.    Treble damages;

D.    Reasonable attorney's fees and costs, including interest and costs incurred in this action; and

E.   All such other and further relief and remedies as this Court deems just and proper and as are justified by the evidence presented at trial in this proceeding.

Respectfully submitted,

**STARK & STARK**
A Professional Corporation

By: _____

Stefanie Colella-Walsh, PA No. 205709
Gene Markin, PA No. 308899

993 Lenox Drive, Building Two
Lawrenceville, NJ 08648
Phone: (609) 219-7416
Phone: (609) 895-7248
Fax: (609) 895-7395
scolellawalsh@stark-stark.com
gmarkin@stark-stark.com

*ATTORNEYS FOR PLAINTIFF, SMA
MEDICAL LABORATORIES, INC.*

Dated:   August 22, 2017

4847-1593-7869, v. 1

## REFERENCE LABORATORY SERVICES AGREEMENT

This REFERENCE LABORATORY SERVICES AGREEMENT ("Agreement") is dated this 14 day of April, 2014 (the "Effective Date") by and between SMA Medical Laboratories, its parents, subsidiaries, divisions, affiliates, and successors, having a principal place of business at 940 Pennsylvania Blvd, Unit A, Feasterville, PA 19053 ("SMA") and ACLS -Advanced Clinical Laboratory Solutions, Inc ("Facility") having a principal place of business at 2277-2283 Coney Island Ave, Suite 3b, Brooklyn, NY 11223. SMA and Facility are each hereafter referred to individually as a "Party" and together as the "Parties."

### BACKGROUND

A. SMA is a clinical laboratory company that requires reference laboratory services ("Services") on a per-request basis for its customers.

B. Facility owns and operates a reference laboratory and is available to provide Services to SMA customers consisting of medical providers including but limited to physicians, group practices, hospitals, outpatient facilities, ASCs and clinics (collectively "Customers").

C. SMA desires to obtain Services from the Facility, and the Facility is willing to provide such Services to SMA, in accordance with the terms and conditions set forth herein.

NOW THEREFORE, in consideration of the foregoing and the mutual covenants, promises and agreements contained herein, the sufficiency of which is hereby acknowledged, the Parties agree as follows:

Section I – Services; Responsibilities of the Parties.

1. Services. Facility agrees to provide Services for SMA on an as-needed basis and in accordance with all applicable federal, state and local laws, rules and regulations, as well as any applicable SMA policies. Services shall include, those tests set forth on Exhibit A. All such tests shall be conducted within the 48 hr. timeframes and on a quality, professional basis consistent with applicable industry standards. Facility and its employees shall maintain all required licenses. SMA shall maintain current Clinical Laboratory Improvement Amendments (CLIA) accreditation.

2. Service Orders. Every specimen from SMA or SMA Customers be sent to the Facility with the appropriate test requisition form.

3. Facility Responsibilities. The above Services will be made available Monday through Friday, from 9:00 a.m. to 5:00 p.m. to SMA. Upon completion of the Services, the Facility will send a final report ("Report") to SMA via facsimile. A printed copy of the report will also be sent to the Facility via U.S. Mail along with the invoice.

1

4. **Reports.** The Facility's report will include at least the following: patient name, date of birth, date of collection, accession number, date of report(s), name of test(s), test result(s), an interpretation of the result(s), and laboratory name and address.

5. **SMA Responsibilities.** SMA will deliver material to be tested ("Material") to the Facility between the hours of 9:00 a.m. and 5:00 p.m., Monday through Friday, in a manner in compliance with Facility's requirements and applicable legal requirements for such transport, as amended from time to time. As between the Parties, SMA is solely responsible for transporting Materials between the Parties and protecting against any unauthorized disclosures of protected health information while the Material is in transit (regardless of whether transfer mode is electronic or otherwise).

### Section II – Compensation & Billing.

6. **Fees.** For Services rendered hereunder, Facility will bill SMA at the rate set forth on the fee schedule attached as Exhibit A . SMA agrees to pay all invoices within thirty (60) days of receipt. No tests or services will be priced or offered below the fair market value.

7. **Facility's Billing Responsibilities.** As between the Parties, SMA is solely responsible for ensuring compliance with all applicable insurance billing regulations including, but not limited to, Medicare and Medicaid reference laboratory billing regulations. It is SMA's responsibility to bill third party payers when appropriate. Facility will provide SMA with a "Super Bill", which will include all billable CPT codes and units according to confirmed test results for each patient tested.

### Section III – Protection of Confidential Information /Non Solicitation.

8. **Confidential Information.** Facility agrees that during the term of Agreement, SMA will make available to it (i) confidential and proprietary information ("Confidential Information" as hereinafter further defined) and trade secrets ("Trade Secrets" as hereinafter further defined) concerning the business as carried on from time to time by SMA which are not generally known in the industry, and (ii) Confidential Information and Trade Secrets of or about SMA, its business partners, licensors, suppliers and other companies, persons or entities with which SMA maintains or has maintained a business relationship, (hereinafter collectively, "SMA Business Relationships"). Facility recognizes that the knowledge and information acquired by Facility concerning the Confidential Information and SMA Business Relationships are valuable, special and unique aspects of the business of SMA. Facility recognizes that such Confidential Information would not be provided to Facility by SMA in the absence of this signed Agreement because of the risks that valuable Confidential Information might otherwise be divulged and thereby damage SMA's competitive position in the marketplace or otherwise damage SMA or SMA Business Relationships. In exchange, Facility agrees to use such Confidential Information solely for SMA's benefit.

9. **Disclosure of Confidential Information:** During the term of this Agreement and following the termination of this Agreement for any reason, Facility will not use or disclose, directly or indirectly, for any reason whatsoever or in any way, other than at the direction of SMA during the course of this Agreement or after receipt of the prior written consent of SMA, any

2



Confidential Information of SMA, that comes into his knowledge during the term of this Agreement by SMA. The obligation not to use or disclose any Confidential Information will not apply to any Confidential Information that is or becomes public knowledge through no fault of Facility, and that may be utilized by the public without any direct or indirect obligation to SMA, but the termination of the obligation for non-use or nondisclosure by reason of such information becoming public will extend only from the date such information becomes public knowledge. The above will be without prejudice to any additional rights or remedies of SMA under any state or federal law protecting trade secrets or other information.

10.   **Trade Secrets.**  Facility shall hold in confidence all Trade Secrets of SMA, its direct and indirect subsidiaries, and/or its customers that came into his knowledge during the term of this Agreement and shall not disclose, publish or make use of at any time after the date hereof such Trade Secrets, other than at the direction of SMA, for as long as the information remains a Trade Secret.

10.1 **Definitions.**   For purposes of this Agreement, the following definitions apply:

"Confidential Information" means any data or information, other than Trade Secrets, that is valuable to SMA and not generally known to the public or to competitors of SMA.  It is understood that the term "Confidential Information" does not mean and shall not include information which:

(A)   is or subsequently becomes publicly available without the breach of any obligation owed to the SMA;

(B)   is disclosed with the prior written approval of the SMA; or

(C)   is obligated to be produced under order of a court of competent jurisdiction or a valid administrative, congressional, or other   subpoena, civil investigative demand or similar process; provided, however, that upon issuance of any such order, subpoena, demand or other process, the Facility shall promptly notify the SMA and shall provide the SMA with an opportunity (if then available) to contest, at the SMA's expense, the propriety of such order or subpoena (or to arrange for appropriate safeguards against any further disclosure by the court or administrative or congressional body seeking to compel disclosure of such Confidential Information).

"Trade Secret" means information including, but not limited to, business plans and methods, trade secrets, products, services, financial affairs, formulae, technology, know-how, contracts, contact lists, costs, policies, sales methods, financial information, profits, expenses, operations, operating methods and procedures, processes, statistics, suppliers, marketing data, strategic information, sales and plans for future developments, methods, reports, plans, strategies and efforts, medical providers, customers, customer lists, customer requirements and information, prospective customers, customer files, proposals and communications with customers and prospective customers, fees, information regarding meeting attendees, employee lists and information, financial and other record

3



systems, records, applications, computers, computer programs, system documentation, hardware, software and information contained therein, marketing and expansion plans, technologies, development, projects, forms and other trade secrets, inventions designs, know-how, any facts concerning the systems, methods, procedures or plans developed or used by SMA or Company Business Relationships or other private, confidential or proprietary information of or about SMA, or Company Business Relationships which is not already available to the public.

11.   **Further contacts with the Customers (Non-Circumvention).** Facility agrees not to contact or initiate contact at any time for any purpose, either directly or indirectly, any Customer of SMA or any of such Customer's officers, directors, shareholders, consultants, attorneys, employees, agents or other affiliates of the Customer, or any other property or properties whose identity was revealed through the efforts of SMA, unless such approval is specifically granted in written form by SMA on a case-by-case basis. Facility further agrees not to undertake any transaction or a series of transactions of any kind with the Customer or to collect any fees in connection with the Customer without the express prior written agreement of SMA, which agreement may be withheld in SMA's sole discretion.

12.   **Non Solicitation.** To protect the goodwill of SMA or the customers of SMA and their respective controlled subsidiaries and affiliates, Facility agrees that, for a period of twenty four (24) months immediately following the termination of this Agreement with SMA, it will not, without the prior written permission of SMA, directly or indirectly, for itself or on behalf of any other person or entity, solicit, divert away, take away, or attempt to solicit, or take away any "Customer" of SMA for purposes of providing or selling services that are offered by SMA, if SMA is then still engaged in the sale or provision of such services at the time of the solicitation. For purposes of this Section III, "Customer" means any individual or entity to whom SMA has provided, or contracted to provide, services or products.

13.   **Interpretation.** The restrictions stated in this Section III are in addition to and not in lieu of protections afforded to trade secrets and confidential information under applicable state law. Nothing in this Agreement is intended to or shall be interpreted as diminishing or otherwise limiting SMA's right under applicable state law to protect its trade secrets and confidential information.

14.   **Value.** Facility acknowledges that it will derive significant value from SMA's agreement in this Section III, to provide it with that Confidential Information of SMA under the terms of this Agreement. Facility further acknowledges that its fulfillment of the obligations contained in this Agreement, including, but not limited to, its obligation neither to disclose nor to use SMA's Confidential Information other than for SMA's exclusive benefit and its obligation not to circumvent contained in Section 13, above, is necessary to protect SMA's Confidential Information and Trade Secrets and, consequently, to preserve the value and goodwill of SMA. Facility further acknowledges the time and scope of the limitations, above, are reasonable, especially in light of SMA's desire to protect its Confidential Information and Trade Secrets, and that Facility will not be precluded from providing Services to other customers during the period.

4

15.   **Covenants.** The covenants contained in this Section III shall be construed as a series of separate covenants. If, in any judicial proceeding, a court refuses to enforce any of such separate covenants (or any part thereof), then such unenforceable covenant (or such part) shall be eliminated from this Agreement to the extent necessary to permit the remaining separate covenants (or portions thereof) to be enforced. In the event any of the provisions of this Section III are deemed to exceed the time, geographic or scope limitations permitted by applicable law, then such provisions shall be reformed to the maximum time, geographic or scope limitations, as the case may be, then permitted by such law.

16.   **Enforcement.** Facility agrees that if Facility violates the covenants and agreements set forth above, SMA would suffer irreparable harm, and that such harm to SMA may be impossible to measure in monetary damages. Accordingly, in addition to any other remedies which SMA may have at law or in equity, SMA will have the right to have all obligations, undertakings, agreements covenants and other provisions of this Agreement specifically performed by Facility, and SMA will have the right to obtain preliminary and permanent injunctive relief to secure specific performance, and to prevent a breach or contemplated breach, of this Agreement. SMA also will be entitled to recover any damages proved to have been caused by any breach of Facility's covenants and agreements hereunder. Such remedies will be an addition to and not in limitation of any injunctive relief or other rights or remedies to which SMA is or may be entitled at law or in equity under this Agreement. In the event SMA is required to enforce the terms of this Agreement through court proceedings, the prevailing party will be entitled to reimbursement for all reasonable legal fees, costs and expenses incident to such enforcement proceedings, including at the pre-trial level, trial level and appellate level.

Facility understands and agrees that the covenants, undertakings and agreements in Section III herein will survive the termination of this Agreement or the cessation of Facility's employment with SMA for any reason. The existence of any claim or cause of action that Facility may have against SMA or any other person, including but not limited to, any claim under this Agreement, will not constitute a defense or bar to the enforcement of any of the covenants and undertakings contained in Section III herein.

Facility recognizes and acknowledges that the restrictions set forth in this Section III: (i) are necessary to preserve SMA's legitimate business interests and information and goodwill; (ii) are appropriately limited in time and scope; and (iii) will not prevent Facility from operating its business.

Facility expressly acknowledges that the restrictions and covenants set forth in this Section III are a material part of the consideration bargained for by SMA and, without Facility's agreement to be bound by such provisions, SMA would not have agreed to enter into this Agreement.

If any court of competent jurisdiction construes any of the restrictions or covenants set forth in this Section III, or any part thereof, to be invalid or unenforceable because of the duration, scope or geographic area covered thereby, such court will have the power to reduce the duration, scope or geographic area of such provision and, in its reduced form, such provision will then be valid and enforceable and will be enforced.

**Section IV -- HIPAA Compliance.**

5



17.   **Patient Information.** Facility, all staff, employees or agents shall not disclose toany third party, except where permitted or required by law, any patient or medical record information regarding SMA's patients, and the SMA and staff, employees and agents shall comply with all applicable federal and state laws and regulations regarding the confidentiality ofsuch information.

18.   **HIPAA Requirements.** To the extent applicable, the Parties agree to comply with the applicable provisions of the Administrative Simplification section of the Health Insurance Portability and Accountability Act of 1996, as codified at 42 U.S.C. § 1320d through d-8 ("HIPAA"), and the requirements of any regulations promulgated there under including without limitation the federal privacy standards as contained in 45 C.F.R. Parts 160 and 164 (the "FederalPrivacy Standards"), the federal security standards as contained in 45 C.F.R. Parts 160, 162 and164 (the "Federal Security Standards") and the federal standards for electronic transactions contained in 45 C.F.R. Parts 160 and 162, each as may be amended from time to time. The Parties agree not to use or further disclose any protected health information, as defined in 45 C.F.R. § 164.504, or individually identifiable health information as defined in 42 U.S.C. § 1320d(collectively, the "Protected Health Information"), concerning a patient other than as permitted by this Agreement and the requirements of HIPAA or regulations promulgated under HIPAA including without limitation the Federal Privacy Standards and the Federal Security Standards.The Parties shall implement appropriate safeguards to prevent the use or disclosure of a patient's Protected Health Information other than as provided for by this Agreement, or as permitted or required by law. Facility will promptly report to SMA any use or disclosure of a patient's Protected Health Information not provided for by this Agreement or in violation of HIPAA, the Federal Privacy Standards, or the Federal Security Standards of which that Party becomes aware.

19.   **Consent.** SMA shall comply with all federal, state and local laws, rules and regulations related to the circumstances under which informed consent must be obtained prior to conducting genetic testing, the content of any such consent, and the manner in which genetic information may be obtained, maintained, reported and/or disclosed.

**Section V – Term and Termination**

20.   **Term.** The initial term of this Agreement shall commence on the Effective Date and terminate on March 31, 2016, unless otherwise terminated as provided herein ("Initial Term"). Thereafter, this Agreement shall automatically renew for one year periods commencing on the anniversary of the Effective Date ("Renewal Term").

21.   **Termination.** Notwithstanding anything herein to the contrary, this Agreement may be terminated at any time as follows:

    (A)   By mutual agreement of the Parties; or

    (B)   With cause by the SMA or Facility upon the default by the other of any term, covenant or condition of this Agreement, where such default continues for a

period of ten (10) business days after the defaulting Party receives written notice thereof from the other Party specifying the existence of the such default; or

(C) The Parties intend that this Agreement comply at all times with all applicable state, federal and local laws, including but not limited to: fraud and abuse statutes; Stark legislation; the federal Anti-Kickback Statute; and federal, state and local civil rights laws; and rules and regulations of applicable healthcare accreditation organizations. If, at any time, a Party in good faith determines that this Agreement does not comply with the law, then the Parties shall use good faith efforts to conform the Agreement in such a manner so that it does appropriately comply. If, after the exercise of such good faith efforts, the Parties determine that this Agreement cannot be so conformed, either Party may terminate this Agreement immediately upon written notice to the other Party.

**Section VI – Miscellaneous**

**22.    Governing Law.** This Agreement shall be governed by and construed in accordance with the laws of the state of Pennsylvania without regard to its conflicts of laws principles.

**23.    Entire Agreement; Written Modification.** This Agreement is the entire agreement between the Parties and supersedes any other oral or written communications, proposals, quotes, advertisements or understandings regarding the subject matter hereof. This Agreement may be amended only in writing, and only if signed by both Parties.

**24.    Severability.** If any of the provisions of this Agreement are held invalid or unenforceable, unless such invalidity or unenforceability substantially frustrates the underlying purpose and intent of the remainder of this Agreement, such invalidity or unenforceability shall not affect the remainder of this Agreement. All terms and conditions are severable and all remedies here under or at law or in equity are cumulative and nonexclusive.

**25.    Waiver.** Any Party's failure to insist upon strict performance of any provision of this Agreement is not a waiver of any of its rights under this Agreement.

**26.    Independent Contractor.** The SMA and Facility are independent contractors for the purposes of this Agreement and neither has the authority to bind the other. No third party is a beneficiary of this Agreement.

**27.    Assignment; Subcontracting.** The Parties may not assign or subcontract this Agreement or any of their respective rights or obligations hereunder without the prior written permission of the other Parties.

**28.    Interpretation.** This Agreement is the product of negotiation between the Parties and shall not be interpreted for or against any Party on account of the role of a Party in the drafting here of. Each appearance of the word "including" or "includes" shall be deemed to include the words "without limitation."

7

AM

29.   **Survival.** In addition to any specific survival references in this Agreement, any terms or obligations that by nature would be expected to survive the termination or expiration of this Agreement shall survive.

30.   **Counterparts; Facsimile.** This Agreement may be executed in one or more counterparts, each of which shall be deemed an original, but all of which shall together constitute one and the same instrument. Signatures provided by facsimile transmission or other electronic delivery shall be deemed to be original signatures.

**(Signature Page Follows)**

8

AM

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be executed by their duly authorized representatives as of the date first set forth above.

SMA MEDICAL LABORATORIES:

By: _M. Shvartsberg_

Name: Mark Shvartsburg
(print)

Title: CEO

Date: 04|18|2014

Address and Contact Information:

_____

_____

_____

ACLS:

By: _____

Name: Anatoly Mecrovich, MD
(print)

Title: President,

Date: 4-18-14

Address and Contact Information:
2277-2283 Coney Island Ave
Suite 3B
Brooklyn NY 11223

9